IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

June 15, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ E. Jones
DEPUTY CLERK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 1:26-CR-00007 |
| v. | ) | |
| | ) | |
| STEPHEN ANTHONY GRAHAM, | ) | By: Hon. Robert S. Ballou |
| | ) | United States District Judge |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Defendant Stephen Anthony Graham moves to suppress evidence seized during a traffic stop from a vehicle driven by codefendant Kourtney Allyson Arnold and in which Graham was a passenger. He also seeks to suppress evidence found in the safe of a hotel room of the Arcadia Inn which he shared with Arnold. Dkt. 63. Graham argues that officers lacked reasonable suspicion to justify the traffic stop. Graham also argues that he had a reasonable expectation of privacy in the hotel room safe, and no exception to the warrant requirement justified the warrantless search.

The Court has considered the evidence presented at the evidentiary hearing on Graham's motion and all legal memoranda submitted. *See* Dkts. 63, 72, 84, 86, 90–91. The preponderance of the evidence establishes that officers observed Arnold commit multiple traffic violations which provided reasonable suspicion to stop the vehicle. Later, Arnold consented to search of her hotel room and the safe found inside the room. Therefore, the motion to suppress evidence is denied.

I.      Background

On July 29, 2025, Detective Brad Loyd, a narcotics detective with the Washington County Sheriff's Office, and Officer Dillion Dye, a narcotics officer with the Bristol Virginia Police Department, were participating in a state probation absconder round-up. Dkt. 72 at 2. They parked their unmarked vehicle at the Arcadia Inn in Bristol, Virginia, a high crime area known for drug activity, to monitor passing vehicles. Although Dye and Loyd were participating in the absconder roundup, Dye testified that their main role was in the narcotics divisions of their respective law enforcement agencies. Dkt. 91-1 at 35:7–9. The previous night, the hotel manager alerted Dye to high foot traffic in the room Arnold and Graham shared. Dkt. 80-1 at 1. The manager also relayed that staff found pieces of burned foil in Arnold's hotel room. *Id*. Around the time Dye and Loyd parked at the Arcadia Inn, Dye asked the hotel manager what kind of car Arnold drove and her checkout time. *Id*. at 4. The manager confirmed that Arnold drove a white car and was due to check out of the hotel that day at 11:00 AM. *Id*. Despite this information, Loyd testified that they were not at the Arcadia Inn to investigate Graham or Arnold. Dkt. 91-1 at 80:9–13. Dye and Loyd witnessed Arnold and Grahm entering the Arcadia Inn parking lot carrying a few belongings. Dkt. 72 at 2; Dkt. 63 at 3. Dye testified that he recognized Arnold from previous narcotics-related interactions, and it appeared to him that Arnold and Graham were arguing. Dkt. 91-1 at 35:21–25, 36:2–9. Dye and Loyd observed Arnold and Graham approach a white Honda as they continued to argue with one another. Dye and Loyd could tell that they were yelling but could not hear what was being said, as they were parked 75 to 100 feet away and had their windows up. *Id*. at 52:9–14.

Dye and Loyd agree that the argument turned into an "potential domestic dispute" when one defendant threw a phone at the other, but their testimony conflicted as to the specifics of the argument. Dye testified that Arnold threw the phone to Graham like a frisbee, causing it to fall

2

into the grass in front of the car, but Loyd recalled that Graham threw the phone to Arnold overhand. Arnold largely corroborated the officers' testimony explaining that Graham slid his phone across the top of the car to show her something and she slid it back. *Id*. at 161:11–14. But Arnold also stated that she and Graham were not arguing, and the phone never hit the ground. *Id*. at 160:10–14, 161:25–162:2. In any case, Arnold and Graham finished loading their belongings into the white Honda and left the hotel parking lot heading south on Lee Highway. Dkt. 72 at 2. Dye and Loyd followed under the belief that Arnold and Graham were having a domestic dispute which warranted additional investigation. *Id*. Because they were in an unmarked vehicle, Dye and Loyd contacted Lieutenant Seth Sparks and Detective Spurlock for backup. *Id*. They advised Sparks that Arnold's vehicle was engaged in a rolling domestic—an assault and battery happening inside of a vehicle while the vehicle was moving. Dkt. 91-1 at 13:20–14:3. Sparks began traveling north from Bristol towards the Arcadia Inn. Dkt. 72 at 2.

Dye and Loyd witnessed Arnold commit multiple lane violations on Lee Highway around the area of Clover Lane and Carriage Circle. Dkt. 91-1 at 37:12–23; Dkt. 72-1 at 4. Graham argues that "the video evidence contradicts the assertion that the vehicle [was] not being driven within a single lane." Dkt. 63 at 3; Dkt. 86 at 2–4. Graham provides a still image from Sparks's dashcam footage that shows the vehicle in its lane. Dkt. 63 at 2; Dkt. 86 at 2–4. At the hearing, Dye testified that Arnold drove mostly in the left lane of the four lane road and crossed the center line multiple times. Dkt. 91-1 at 60:7–13. Loyd testified that Arnold weaved within her lane and hit the lines on either side multiple times. *Id*. at 79:5–11. Loyd described this action as "bumping the line" consistent with an intoxicated driver. *Id*. at 79:8, 109:6. Graham also argues that Loyd and Dye's testimony contradict Dye's written report. Specifically, Dye's report states that Arnold crossed the white line multiple times. Dkt. 72-1 at 4. The Google Maps images provided by the

3

parties show that the center divider on Lee Highway is yellow, not white. *See* Dkt. 91 at 6–8; Dkt. 86 at 3. The Government points out that there are other white lines on Lee Highway, including in the area of Clover Lane and Carriage Circle. Dkt. 91 at 9.

For her part, Arnold maintained that she did not commit any lane violations but admitted that she was under the influence of both fentanyl and cocaine at the time. Dkt. 91-1 at 171:2–7. The officers also testified that it appeared the argument continued inside the vehicle, as Graham and Arnold were gesturing while driving. Graham argues that Dye and Loyd could not have seen inside the car because Sparks's dashcam footage shows that there was a car between their police cruiser and Arnold. Dkt. 86 at 5. The dashcam footage does not show the area where the alleged lane violations occurred. Dkt. 91 at 10; Dkt. 72-1 at 4. Arnold maintained that there was no argument but admitted that she gestures frequently while talking and that may have been what the officers saw. Dkt. 91-1 at 162:25–163:4.

After observing the traffic violations, Loyd asked Sparks to initiate a traffic stop. Dkt. 72 at 2. The officers relied on lane violations as the basis for the stop. Just before the stop, one car and approximately 400 feet separated Dye and Loyd's unmarked vehicle from Graham and Arnold. Dkt. 62-2[1] at 2:00–2:10. Sparks, traveling in the opposite direction, passed Arnold's vehicle and made a U-turn to initiate the stop. *Id*. at 2:08–2:12. Graham and Arnold made a quick turn off Lee Highway into the driveway of 1952 Lee Highway.[2] Dkt. 72-1 at 4. Arnold admitted that she did not know why she turned into the driveway and did not know the residents of the home. Dkt. 91-1 at 172:23–173:11. Sparks activated his police lights and pulled into the

---

[1] The Government references the dash cam footage provided as an exhibit to their response to Arnold's motion to suppress. As Arnold pled guilty to the offense, her motion has been terminated as moot.

[2] The distance between 1952 Lee Highway and the Arcadia Inn is approximately 1.3 miles and a 4-minute drive.

driveway behind Arnold. Dkt. 72 at 3. Arnold exited the vehicle as Sparks pulled into the driveway. Dkt. 58 at 2. Arnold appeared startled to see the marked police vehicle flashing emergency lights and initially ignored Sparks's orders to get back into the vehicle. Dkt. 68 at 2. Instead, she reached inside the vehicle. *Id*. This movement prompted Sparks and Dye to draw their weapons and order Arnold to the front of Sparks's police cruiser. *Id*. Dye approached the passenger side and directed Graham to exit. *Id*. at 4. The Government argues that Arnold's surprise and movement reaching back into the vehicle was "erratic behavior" that required temporary detention to protect officer safety. Dkt. 72 at 3 n.3.

Arnold admitted to Dye that she had a pipe in the vehicle and asked him not to search it. *Id*. at 3. Loyd approached the vehicle and noticed a piece of burnt foil in plain view on the passenger's side of the car, near where Graham had been seated. *Id*. Other officers, including Detective Spears, Virginia Police Officer Peery, Virginia Probation Officer Jeff Tester, United States Probation Officer Jason Varney, and Detective Harris, were also present at the scene. Dkt. 63 at 5. The burnt foil and Arnold's statement about the pipe prompted a "probable cause" search of the vehicle. Dkt. 72 at 3. The search revealed "quantities of cocaine, fentanyl, methamphetamine, $903.00 in United States Currency, and . . . drug paraphernalia." Dkt. 63 at 5. These items were found "in a black box under the driver's seat, which also contained cash and a key, as well as in a bag that contained Graham's mail." Dkt. 72 at 3.

Officers placed Graham under arrest and took him to the Abingdon Regional Jail. Arnold went with Sparks, Spurlock, and several other officers to the local DEA parking lot and then with law enforcement to her room at the Arcadia Inn. She had rented the room for five days in her name. Dkt. 72-3. At the time Arnold was homeless and lived in the Bristol area in hotels, including the Arcadia Inn. Dkt. 91-1 at 166:11–14. Graham stayed in the room with Arnold the

5

previous night. Dkt. 63 at 5. Arnold consented to the search of her hotel room and was present during the search. *Id.* Detective M. Harris, Detective Spurlock, and Officer Spears conducted the hotel room search. Dkt. 72-2 at 4. Inside the room, officers found drug paraphernalia and a safe. Dkt. 72 at 3. Spears testified that Arnold specifically consented to search of the safe, although she did not have a key to open it. Dkt. 91 at 121:22–123:1. Spears contacted the Arcadia Inn manager, who provided a master key to open the safe. Dkt. 72-2 at 4. At some point, either before or after officers searched the safe, Arnold advised officers that the contents of the safe belonged to Graham and that she had seen him accessing the safe.[3] *Id.*; Dkt. 91-1 at 122:22– 123:3. At the hearing, Arnold testified that the narcotics found in the safe belonged to both of them, and she may have used the safe the day before but did not remember clearly. Search of the safe revealed cocaine, fentanyl, and $1,201.00 in United States currency. Dkt. 63 at 6. Officers also located pill bottles labeled with Graham's name. Dkt. 72 at 4.

Graham has a lengthy criminal history and was serving a four-year term of federal supervised release following his release from federal incarceration on January 7, 2025. *See* Order on Petition for Issuance of Warrant-Revocation, *United States v. Graham*, 1:18-cr-00025 (W.D. Va. July 29, 2025), Dkt. 1676. His original federal sentence, imposed in April 2012 by the Eastern District of Tennessee, was 60 days custody, five years supervised release for conviction of conspiracy to distribute and possess with the intent to distribute marijuana. *Id.* In 2015, the Eastern District of Tennessee transferred supervision to the Western District of Virginia. Transfer of Jurisdiction, *United States v. Graham*, 1:15-cr-00007 (W.D. Va. Mar. 11, 2015), Dkt. 1. In

---

[3] In his motion, Graham appears to assert that Arnold told officers that the contents of the safe belonged to Graham before the search. Dkt. 63 at 6. But the officers' uncontradicted testimony at the hearing revealed that Arnold did not disclaim ownership of the contents of the safe until after officers searched it.

2016, Graham's supervision was revoked, and he was sentenced to 8 months custody and 3 years supervised release. Judgment, *United States v. Graham*, 1:15-cr-00007 (W.D. Va. Oct. 11, 2016), Dkt. 28. In 2018, Graham was indicted for additional drug crimes and sentenced in 2020 to 84 months custody and four years supervised release. Judgment, *United States v. Graham*, 1:18-cr-00025 (W.D. Va. Jan. 14, 2020), Dkt. 873. As a condition of his current term of federal supervision, which commenced January 7, 2025, Graham was required to

> [S]ubmit his person, property, house, residence, vehicle, papers, . . . or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

Dkt. 72-5 at 5. Additionally, in 2023, Graham was convicted in state court for possession of hydrocodone and acetaminophen and possession of alprazolam. Dkt. 72-4. The plea agreement included a waiver of Fourth Amendment rights:

> Furthermore, during any period of probation impose pursuant to this agreement, the defendant shall waive his/her Fourth Amendment right against unreasonable searches and seizures during such probation period, to-wit: he/she shall submit his/her person, place of residence and property to search or seizure at any time of the day or night by any law enforcement officer with or without a warrant.

Dkt. 72-4 at 2. After serving six months incarceration, Graham began his two-year period of probation on September 16, 2024. Relevant here, Graham's 2024[4] acknowledgment of the conditions of probation in state court reiterated his wavier of Fourth Amendment rights. Dkt. 72-6 at 2.

---

[4] Graham signed a second acknowledgment of conditions of probation in April 2025. *See* Dkt. 72-7. That acknowledgment did not include a waiver of his Fourth Amendment rights. Even so, in his plea agreement, Graham agreed to waive his Fourth Amendment rights "during any period of probation imposed pursuant to this agreement." Dkt. 72-4 at 2. Therefore, the waiver still applied.

Graham seeks to suppress the evidence found during the search of the vehicle and hotel room safe. He first argues that the officers lacked reasonable suspicion to stop the vehicle, so all evidence obtained after the unlawful stop must be suppressed. As to the hotel room safe, Graham argues that Arnold did not have authority to consent to the officers' search, so evidence obtained from the search of the safe must be suppressed.

## II.    Discussion

The Fourth Amendment guarantees "the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A defendant seeking suppression bears the initial burden of proving that he has "standing" under the Fourth Amendment, which requires a reasonable expectation of privacy in the area searched. *United States v. Lowers*, 170 F.4th 134, 153 (4th Cir. 2026). Once the defendant establishes a reasonable expectation of privacy, "[t]he government bears the burden of proof in justifying a warrantless search or seizure." *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984)). "At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Hale*, No. 7:19-CR-004, 2023 WL 6465141, at *3 (W.D. Va. Oct. 2, 2023) (quoting *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 492 (E.D. Va. 2014)), *aff'd*, No. 23-4769, 2025 WL 33132 (4th Cir. Jan. 6, 2025).

A.  Vehicle Search

Traffic stops are subject to the Fourth Amendment reasonableness requirement. *Whren v. United States*, 517 U.S. 806, 809–10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose,

constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment].")."Detention

of passengers during a traffic stop provides the basis for them to challenge the legality of the stop

under the Fourth Amendment." *McGee*, 736 F.3d at 269 (citing *Brendlin v. California*, 551 U.S.

249, 256–63 (2007)). The Court assesses the reasonableness of a traffic stop under the standard

from *Terry v. Ohio*, 392 US. 1 (1968), which requires (1) a legitimate basis for the stop and (2)

that the actions of the authorities during the stop were reasonably related to the reasons for the

stop. *United States v. Palmer*, 820 F.3d 640, 648–49 (4th Cir. 2016). Graham argues only that the

officers lacked a legitimate basis for the stop but does not challenge that probable cause to search

the vehicle developed after the stop. Dkt. 63 at 6–7; Dkt. 91-1 at 202:15–23. Therefore, I address

only whether there was reasonable suspicion to initiate a traffic stop.

Officers have a legitimate basis for a traffic stop if they have reasonable suspicion that

criminal activity is afoot. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). Reasonable suspicion

requires "a particularized and objective basis for suspecting the particular person stopped of

criminal activity." *Id*. (quoting *United States v. Cortez*, 440 U.S. 411, 417–18 (1981)). This basis,

including all rational inferences, must provide "more than an inchoate and unparticularized

suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir.

2008) (citations omitted). The "reasonable suspicion" standard is considerably lower than a

preponderance of the evidence, and less than is required for probable cause. *Id*. Reasonable

suspicion can be based on innocent actions, although courts are "skeptical of Government

attempts to spin largely mundane acts into a web of deception." *United States v. Hawkins*, 161

F.4th 242, 246 (4th Cir. 2025) (cleaned up) (citations omitted)). Still, in assessing whether

officers had reasonable suspicion, "[c]ourts must look at the 'cumulative information available'

to the officer," considering the context of the situation and the expertise of police officers.

*Branch*, 537 F.3d at 336–37 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The Government argues that the traffic violations, considering the totality of the circumstances, created reasonable suspicion to justify the traffic stop.

In the context of traffic stops, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. An officer's subjective intent is irrelevant, so a traffic stop will be upheld if the circumstances objectively show that the officer had reasonable suspicion for the stop. *Palmer*, 820 F.3d at 649; *Whren*, 517 U.S. at 814. Here, the totality of the circumstances shows that Dye and Loyd "observed enough 'specific and articulable facts' to generate a 'reasonable suspicion' of illegal activity." *Branch*, 537 F.3d at 338.

The Government asserts that during the four-minute, 1.3-mile drive from the Arcadia Inn to 1952 Lee Highway, Dye and Loyd "observed Arnold's vehicle cross the white lane lines multiple times." Dkt. 72 at 5. Because Dye and Loyd were in an unmarked vehicle, they communicated the lane violations to Sparks and directed him to initiate a traffic stop.[5] Virginia law requires that "[a] vehicle shall be driven as nearly as is practicable entirely within a single lane and shall not be moved from that lane until the driver has ascertained that such movement can be made safely." Va. Code § 46.2-804(2). The Government argues that Arnold's failure to maintain her lane constituted a traffic violation, and therefore the stop was reasonable. Dkt. 72 at 5. Graham argues that the stop was wholly pretextual, and Dye and Loyd are lying about

---

[5] Even though Sparks did not witness the traffic violations, the reasonable suspicion and probable cause standards are met if "the search or arrest is directed by an officer who himself has sufficient knowledge to amount to probable cause." *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020). Since Dye had personal knowledge of the traffic violations and directed Sparks to execute a traffic stop, Dye's knowledge can be imputed to Sparks.

witnessing lane violations. In the alternative, Graham argues that lane violations are not traffic violations under Virginia law and therefore cannot provide the basis for reasonable suspicion.

There is evidence that the stop was pretextual in this case. The day before the stop, Dye received a tip indicating that Arnold was engaged in drug activity at the Arcadia Inn, and that she intended to check out and take any belongings, including drugs, the following day. Dkt. 80. Although Dye and Loyd were participating in a state absconder roundup that day, neither testified that they were at the Arcadia Inn as part of the roundup. Even assuming Dye and Loyd directed initiation of the traffic stop with the subjective intent of investigating Arnold and Graham for narcotics offenses, that alone does not render the stop unlawful. *Palmer*, 820 F.3d at 649. Regardless of officers' subjective intent, a stop is reasonable if it is justified by probable cause or reasonable suspicion. *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013). As the officers' subjective motivation is not dispositive, the issue is (1) whether the record supports a finding that Arnold committed a traffic violation and (2) whether that traffic violation justifies the traffic stop.

A preponderance of the evidence supports the finding that Arnold failed to maintain her lane during the incident. First, Dye and Loyd testified consistently that Arnold committed multiple lane violations, an assertion echoed in Dye's incident report. Second, Arnold admitted that she was under the influence of cocaine and fentanyl. This admission both undermines her credibility as to the events of that day and bolsters the officers' assertion that she failed to maintain her lane. Graham identifies at least one relevant inconsistency in the officers' testimony: that the center line on Lee Highway is yellow, not white. However, the fact of the lane violations and the area where they occurred is consistent across Dye and Loyd's testimony and Dye's written report. Graham argues that Dye and Loyd could not have seen inside Arnold's

11

vehicle because dashcam footage shows that there was car between her vehicle and the police cruiser. Dkt. 86 at 5. This argument is unpersuasive, as the officers testified that a car may have gotten between their police cruiser and Arnold, and in any case the dashcam footage does not show the configuration of the cars at the time of the alleged lane violations.

Graham also identifies other purported inconsistencies, such as the means of communication between Loyd and Dye and other officers and the exact information relayed to Sparks. *Id*. at 6, 9; Dkt. 91 at 12–13. To the extent that the officers' testimony was inconsistent, these minor inconsistencies are likely attributable to the time elapsed since the incident. Further, Loyd does not regularly work in the area and therefore is unfamiliar with Lee Highway. By contrast, Arnold admitted to making false statements to the officers during their hotel room search and to being under the influence of cocaine and fentanyl at the time of the incident. Therefore, the Court credits the officers' testimony and finds that the preponderance of the evidence supports the conclusion that Arnold committed lane violations on Lee Highway around Clover Lane and Carriage Hill.

Arnold's failure to maintain her lane, considered in context, provided reasonable suspicion to execute a traffic stop. In several unpublished decisions, the Fourth Circuit has held that failure to drive within a lane is a traffic violation that can justify a traffic stop. *United States v. Flores*, 368 F. App'x 424, 431 (4th Cir. 2010) (holding that officer's observation of the defendant swerving out of his lane three times is sufficient for probable cause); *United States v. Gallardo-Gonzalez*, 331 F. App'x 255, 257 (4th Cir. 2009) (holding that officer's observation of the defendant's vehicle crossing the fog line is sufficient for probable cause). Although the Southern District of West Virginia recently held that "a single fog line crossing is insufficient, without more, to create probable cause when the statute merely requires that a vehicle be driven

within a single lane of traffic 'as nearly as practicable,'" the circumstances of this case, which involve multiple lane violations, are more similar to *Flores* and *Gallardo-Gonzalez*. *United States v. Womack*, 546 F. Supp. 3d 494, 501 (S.D.W.V. 2021).

Even if a lane violation is not a traffic violation under Virginia law, reasonable suspicion may rest on an objectively reasonable mistake of law. *Heien v. North Carolina*, 574 U.S. 54, 61 (2014). The Eastern District of Virginia held that an officer's belief that touching a fog line constitutes a traffic violation was reasonable. *United States v. Williams*, 945 F. Supp. 2d 665, 673–74 (E.D. Va. 2013). Therefore, even if Dye and Loyd were mistaken in concluding that a lane violation is a traffic offense, the multiple lane violations created a reasonable suspicion that criminal activity was afoot.

The totality of the circumstances further bolsters a finding that the stop was justified by reasonable suspicion. Certain driving behaviors, including weaving all over the roadway, crossing the centerline, and driving in the median, are "sound indicia" of drunk driving. *Navarette v. California*, 572 U.S. 393, 402 (2014) (citations omitted). Loyd testified that Arnold's conduct was common in drivers operating while under the influence. Dye and Loyd also testified that they witnessed Arnold and Graham making furtive movements inside the vehicle that suggested escalation of their parking lot argument into a domestic incident. The fact that Arnold and Graham were seen leaving the Arcadia Inn, a location known for drug activity coupled with the manager's observation of unusual activity around Arnold's room, also bolsters an objective finding of reasonable suspicion. Although insufficient on its own, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted). These circumstances, taken together, are sufficient for reasonable suspicion. Therefore, because the officers had several

13

reasonable, objective bases for the stop, the motion to suppress the evidence obtained in vehicle search is denied.

    B.  Hotel Room Safe Search

Graham argues that the warrantless search of the safe in Arnold's Arcadia Inn hotel room violated his Fourth Amendment rights. In assessing whether suppression is appropriate, the analysis proceeds in two steps. First, "to secure relief from an unconstitutional search, 'a person must have a cognizable Fourth Amendment interest in the place searched.'" *United States v. Frazer*, 98 F.4th 102, 113 (4th Cir. 2024) (quoting *Byrd v. United States*, 584 U.S. 395, 410 (2018)). A cognizable interest requires that the defendant have a reasonable expectation of privacy in the place searched.[6] *Id*. Second, if Graham establishes a reasonable expectation of privacy in the safe, the burden shifts to the government to justify the warrantless search. *McGee*, 736 F.3d at 269 (citing *Welsh*, 466 U.S. at 749–50). Warrantless searches are per se unreasonable under the Fourth Amendment subject to a few established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). One established exception is consent, which justifies a warrantless search if consent is "(1) knowing and voluntary and (2) given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citations omitted) (cleaned up). Absent the applicability of a particular warrant exception, a warrantless search may also be deemed reasonable by weighing "the degree to which [the search] intrudes upon an individual's privacy and . . . the degree to which it is needed for the promotion of a legitimate governmental interest. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999).

---

[6] The reasonable expectation of privacy in a place that is searched is sometimes referred to a Fourth Amendment standing.

Graham argues that he had a reasonable expectation of privacy in the hotel room safe as an occupant of the room and Arnold lacked authority to consent to the search. Dkt. 63 at 7–8. The Government argues that Graham's status as a probationer diminished his reasonable expectation of privacy, rendering the search reasonable under the totality of the circumstances. Dkt. 72 at 8–13. In the alternative, the Government argues that Arnold validly consented to search of the safe. *Id.* at 14–19.

1. *Reasonable Expectation of Privacy*

"[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–72 (1969). Therefore, a defendant must establish a reasonable expectation of privacy in the area searched. *United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021). A defendant has a reasonable expectation of privacy if (1) the individual manifested a subjective expectation of privacy in the area searched and (2) society is willing to recognize that expectation as reasonable. *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

a. **Subjective Expectation of Privacy**

An individual has a subjective expectation of privacy when he has acted to keep the area private. *Id.* ("[O]bjects, activities, or statements that [a man] exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited."). "When attempting to determine whether a defendant has a reasonable expectation of privacy in property that is held by another, we consider such factors as 'whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from that property.'" *United States v. Castellanos*, 716 F.3d 828,

833–34 (4th Cir. 2013) (quoting *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)). In this case, Graham claimed an ownership interest in the property inside the safe. *See* Dkt. 63 at 6 ("[Arnold] further reported that she had seen Mr. Graham accessing the safe and the contents of the safe were Mr. Grahams [sic]."). Graham also took precautions to exclude others from accessing the property by locking it in the safe. As a result, Graham exhibited a subjective expectation of privacy.

### b. Objective Expectation of Privacy

Even if an individual demonstrates a subjective expectation of privacy, he has a reasonable expectation of privacy only if his subjective expectation is objectively reasonable. A guest in a hotel room generally has a reasonable expectation of privacy in that hotel room for the duration of his stay. *Stoner v. California*, 376 U.S. 483, 490 (1964); *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997); *United States v. Stein*, No. 2:21-CR-00067, 2022 WL 1143522, at *4 (E.D. Va. Apr. 18, 2022). An individual's status as an overnight guest in a home also creates a reasonable expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). Recently, this Court held that an overnight guest in a hotel room, even if he did not rent the room, could have a reasonable expectation of privacy in the room. *United States v. Perry*, No. 1:25-CR-00011, 2025 WL 2938819, at *3 (W.D. Va. Oct. 16, 2025). Therefore, generally, an individual staying the night in a hotel room, even if he is not the renter, has a reasonable expectation of privacy in that room.

The Government argues that this case is distinguishable because Graham waived his Fourth Amendment rights pursuant to a state plea agreement and as a condition of federal supervised release. Dkt. 72 at 9. In the Government's view, that waiver significantly diminished

or otherwise eliminated Graham's reasonable expectation of privacy. *Id*. at 11. Graham argues that the Government failed to prove a valid waiver. Dkt. 90 at 1–2.

There are two divergent approaches to the impact of a probation waiver on a defendant's Fourth Amendment rights. *See United States v. Perez*, 167 F.4th 709, 716–17 (4th Cir. 2026). In *Griffin v. Wisconsin*, the Supreme Court upheld a warrantless search to a probationer's residence based only on reasonable suspicion under the "special needs" exception to the warrant requirement. 483 U.S. 868, 873 (1987). Although the Court noted that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled,'" the waiver justified a search based on an exception to the warrant requirement, not because it eliminated or necessarily diminished a probationer's reasonable expectation of privacy. *Id*. at 874 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). In *United States v. Knights*, the Supreme Court applied the totality of the circumstances approach, finding that the probation condition "significantly diminished Knights' reasonable expectation of privacy" and was needed for the promotion of legitimate government interests. 534 U.S. 112, 119–20 (2001). Recently, the Fourth Circuit surveyed these cases and described the probation waiver as an exception to the warrant requirement. *Perez*, 167 F.4th at 715. Under either approach, the Supreme Court has avoided deciding whether a probation waiver completely eliminates a defendant's reasonable expectation of privacy. *Knights*, 534 U.S. at 120 n.6. Given these considerations, I find that Graham had a reasonable expectation of privacy, although potentially diminished, that provides him standing to challenge the search of the hotel room safe. Because I find that Graham had a reasonable expectation of privacy even if he waived his Fourth Amendment rights, I decline to address Graham's argument that the Government failed to prove that the state court accepted the plea agreement and imposed the waiver.

2. *Consent*[7]

The determination that Graham had a reasonable expectation of privacy in the hotel room

safe does not end the inquiry. Warrantless searches may be reasonable under the Fourth

Amendment if an exception to the warrant requirement applies, or if the search is reasonable

under the totality of the circumstances. *Katz*, 389 U.S. at 357; *Houghton*, 536 U.S. at 300.

A well-recognized exception to the warrant requirement exists when officers obtain

voluntary consent "from the individual whose property is searched or from a third party who

possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)

(citations omitted) (cleaned up). Even if a third party lacks actual authority to consent, the search

remains valid if officers reasonably believe that the third party has authority to consent. *Id*. at

188. An officer may reasonably rely on apparent authority to consent where "the facts available

to the officer warrant a person of reasonable caution in the belief that the consenting party had

authority." *United States v. Toyer*, 414 F. App'x 584, 588–89 (4th Cir. 2011) (citing *Rodriguez*,

497 U.S. at 188). In evaluating reasonableness, a court must view the facts "in light of the

totality of the circumstances known to the officers at the time of the search." *Buckner*, 473 F.3d

at 555 (emphasis omitted).

The Government argues that even if Graham retained some expectation of privacy, it was

so diminished that the search was reasonable considering the totality of the circumstances. Dkt.

72 at 12–13. In the alternative, the Government argues that Arnold had actual and apparent

authority to consent to search of the safe. *Id*. at 14. Because I find that Arnold had actual

authority to consent to the search, it is unnecessary to address the reasonableness of the search

---

[7] As the issue of Arnold's consent is determinative, I decline to reach the Parties' additional briefing as to whether Graham's Fourth Amendment waiver provides an exigency to the warrant requirement or justifies the search in the totality of the circumstances.

under the totality of the circumstances or, formulated differently, the "probation exception" to the warrant requirement.

### a. Actual Authority

Actual authority to consent to a search requires that the consent be "(1) 'knowing and voluntary' and (2) given by one with authority to consent." *Buckner*, 473 F.3d at 554 (citations omitted). In this case, Graham argues only that Arnold did not have authority to consent to the search of the safe. A third party has authority to consent to the search of another's property if the third party "possesses common authority over the premises." *Rodriguez*, 497 U.S. at 181. Common authority has two elements: (1) mutual use and (2) joint access or control of the area searched. *Buckner*, 473 F.3d at 554 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). Authority to consent to a general area does not "automatically extend to the interiors of every discrete enclosed space capable of search within the area." *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978). This limitation reflects the commonsense conclusion that "the law's 'enclosed spaces' mankind's valises, suitcases, footlockers, strong boxes, etc. are frequently the objects of his highest privacy expectations." *Id*. If the area searched is set aside for the absent defendant's "exclusive use," a third party cannot consent to the search. *Reeves v. Warden*, 346 F.2d 915, 925 (4th Cir. 1965) (holding that the defendant's mother could not consent to a search of the defendant's room and bureau that were set aside for his exclusive use); *see also Toyer*, 414 F. App'x at 588 ("'Common authority' is not merely a question of property interest but requires evidence of 'mutual use' by one generally having 'joint access or control for most purposes.'" (quoting *Matlock*, 415 U.S. at 171 n.7)); *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992) (holding that lack of mutual use and general access prohibited a third party from issuing valid consent to search the defendant's locked closet). Therefore, a third party has actual

authority to consent to search of a closed container only if she has general or joint access through mutual use of the container specifically.

Graham concedes that Arnold, as the renter and co-occupant of the room, had actual authority to consent to search of the room generally. Graham argues that because Arnold did not have a key to the safe or any property in the safe, she could not consent to its search. Although Arnold's authority to consent to search of the room does not automatically extend to the safe, she had actual authority to consent to the search of the safe because she had general access to and used the safe.

First, Arnold did not have a key to the safe, but she had general access. Arnold rented the hotel room solely in her name, so she could access the safe because of her rental agreement. In *Buckner*, the Court held that the third party did not have actual authority because the defendant used a password to protect his computer files and therefore did not assume the risk that a joint user might permit others to search the files. 473 F.3d at 554. By contrast, in this case, Graham assumed the risk that Arnold might allow search of the safe because she had the right to obtain a key from hotel staff because of her status as the sole renter. *See United States v. Gibson*, No. 5:24-CR-68, 2025 WL 2627682, at *5 (E.D.N.C. Sept. 11, 2025) ("[A] party has actual authority to consent to a storage-unit search when the party has a right to enter the unit under the terms of the rental agreement with the storage facility." (citations omitted)). Unlike the third party in *Block*, Arnold did not "disclaim[] for herself any shared right of access to [the safe]." 590 F.2d at 541. In fact, Arnold testified that she may have accessed the safe the day before the search, although she could not be sure on that point. Given these factors, I conclude that Arnold had general access to the safe.

20

Second, Arnold mutually used the safe. Although at the time of the search Arnold told officers that the entire contents of the safe belonged to Graham, she testified at the suppression hearing that the drugs found in the safe belonged to both of them. Therefore, it is not as if the search area was set aside exclusively for Graham's use. *See Reeves*, 346 F.2d at 925. Because Arnold was a co-user of the safe, she "ha[d] the right to permit the inspection in [her] own right" and Graham assumed the risk that she might permit such inspection. *Matlock*, 415 U.S. at 171 n.7. Therefore, because Arnold had actual authority to consent to the search of the safe, the search is reasonable under the Fourth Amendment.

### b. Apparent Authority

Even assuming the fact that Arnold did not have a key to the safe deprived her of actual authority to permit the search, Arnold had apparent authority to consent. Apparent authority exists when a third party lacks actual authority to consent to the search, but officers reasonably believe the third party has actual authority. *Rodriguez*, 497 U.S. at 188. In evaluating reasonableness, a court must view the facts "in light of the totality of the circumstances known to the officers at the time of the search." *Buckner*, 473 F.3d at 555. In this case, Arnold, the sole renter of the hotel room, explicitly consented to the search of the safe. She did not disclaim ownership of anything in the safe until after the search. The fact that Arnold did not have a key, without more, is insufficient to negate apparent authority. *See United States v. Turner*, No. 3:24-CR-00008, 2025 WL 3035755, at *3 (W.D. Va. Oct. 30, 2025). The information known to officers at the time of the search did not suggest that Graham used the safe exclusively. *See United States v. Gardner*, 554 F. App'x 165, 167 (4th Cir. 2014). Therefore, considering the totality of the circumstances, it was reasonable for officers to conclude that Arnold had authority to consent to the search of the safe.

Arnold had at least apparent, if not actual, authority to consent to the search of the hotel room safe. Therefore, it is unnecessary to evaluate the reasonableness of the search under the totality of the circumstances or apply the probation exception to the warrant requirement. Because Arnold consented to search of the safe, the search was reasonable under the Fourth Amendment, so the motion to suppress the evidence obtained from the safe is denied.

### III.    Conclusion

For the foregoing reasons, Graham's motion to suppress the evidence obtained from Arnold's vehicle and the hotel room safe (Dkt. 63) is **DENIED**. An appropriate Order shall follow.

It is so **ORDERED**.

Entered:  June 15, 2026

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

22